UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | | |
|---|---|---|
| In re: | : | CHAPTER 7 |
| | : | |
| FIRST CONNECTICUT | : | CASE No. 02-50852 (JJT) |
| CONSULTING GROUP, INC., | : | |
| Debtor. | : | Re ECF Nos.: 2704, 2707, 2716, 2732, 2733 |
| In re: | : | CHAPTER 7 |
| | : | |
| JAMES J. LICATA, | : | CASE No. 02-51167 (JJT) |
| Debtor. | : | |
| | : | Re ECF Nos.: 1006, 1011, 1028, 1034, 1035 |

**MEMORANDUM OF DECISION ON
MOTIONS FOR AN ORDER CONVERTING CHAPTER 7 CASES
TO CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

*Introduction*

Before the Court are James Licata's ("Licata") motions seeking entry of an order reconverting his individual Chapter 7 case and the Chapter 7 case of First Connecticut Consulting Group, Inc. ("FCCG") to cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), pursuant to Section 706(b) of the Bankruptcy Code (ECF Nos. 2704 and 1006, in the cases of FCCG and Licata, respectively, the "Motions"). Licata is the president and fifty percent shareholder of FCCG. These bankruptcy cases are more than fifteen (15) years old, outlasting many of the practitioners and jurists who came to learn their innumerable and often interwoven strands. As one court faced with a series of related First Connecticut bankruptcy cases observed some thirteen (13) years ago, Licata and his former business partner, Peter Mocco ("Mocco"), had woven so many "loops and knots" through complex transactions, legal skirmishes and elaborate deceits that they had created a web of strands "so entangled that even the parties

have a hard time separating and making sense of them." *In re First Connecticut Consulting Grp., Inc.*, 2004 WL 1676211, at \*1 (Bankr. D. Vt. July 27, 2004), *aff'd*, 340 B.R. 210 (D. Vt. 2006), *aff'd*, 254 F. App'x 64 (2d Cir. 2007). More than ten (10) years later, this Court (Shiff, J.) noted, "the web has expanded with more strands and additional loops and knots." *In re First Connecticut Consulting Grp., Inc.*, 2014 WL 5092269, at \*1 (Bankr. D. Conn. Oct. 9, 2014), *dismissed sub nom. Licata v. Coan*, 2015 WL 9699304 (D. Conn. Sept. 22, 2015), *aff'd sub nom. In re Licata*, 659 F. App'x 704 (2d Cir. 2016). Now, with the end of these bankruptcy cases finally within sight, Licata asks this Court to turn back into the abyss.

For the reasons set forth herein, the Court declines to do so.

*Relevant Background and Procedural History[1]*

Prior to commencing his Chapter 11 case, Mr. Licata was engaged in protracted litigation against his former business partner, Peter Mocco, in the State of New Jersey (the "New Jersey Litigation"). The central dispute in the New Jersey Litigation was the identity of the owner(s) of certain real estate assets located in New Jersey (the "Disputed Claims").

On June 27, 2002, Mr. Licata filed a voluntary petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Middle District of Florida. FCCG filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 12, 2002 with this Court. Upon the motion of the United States Trustee for the Middle District of Florida to transfer venue, Licata's bankruptcy case was transferred to this Court on September 20, 2002. On December 30, 2002, the Chapter 11 cases of Licata and FCCG were administratively consolidated.

---

[1] In the interest of economy, the Court assumes the parties' familiarity with the voluminous record of these bankruptcy cases and provides only the background necessary to give context to this decision. Though certain facts cited herein were advanced in connection with the Motions, much of the following background was adduced through reference to prior decisions, related docket entries and admissions of the parties.

Also in September of 2002, Licata filed voluntary petitions for bankruptcy relief under

Chapter 11 of the Bankruptcy Code with this Court for several LLCs bearing the name First

Connecticut Holding Group (the "LLCs"). *In re First Connecticut Consulting Grp., Inc.*, 2004

WL 1676211, at *10 (Bankr. D. Vt. July 27, 2004), *aff'd*, 340 B.R. 210 (D. Vt. 2006), *aff'd*, 254

F. App'x 64 (2d Cir. 2007). Mocco filed a motion to dismiss the cases, claiming that Licata

lacked authority to file the petitions, given his lack of ownership interest in the LLCs and the real

estate they controlled. In January of 2004, these cases and the motion to dismiss were transferred

to the Bankruptcy Court for District of Vermont (Brown, J.). Following an eight-day trial on the

motion to dismiss, Judge Brown held "that Licata had no ownership interest in the LLCs as of

the date he filed the LLC bankruptcy petitions."[2] Judge Brown further determined that Licata

had filed the petitions in bad faith to impede pending litigation in another court, which litigation

might have conclusively defeated his claim to ownership of the LLCs.[3] Judge Brown also noted

that Litica's testimony concerning the nature of his agreement with Mocco was "both disturbing

and disingenuous."[4] Licata appealed the bankruptcy court's ruling to both the District Court and

the Court of Appeals without success.

No fewer than seven motions were filed seeking conversion of these bankruptcy cases to

Chapter 7.  On April 3, 2006, the United States Trustee filed a statement in support of the

conversion of the FCCG and Licata cases "[i]n light of the March 22, 2006 indictment of James

J. Licata, the debtor-in-possession herein, by the Grand Jury currently impaneled in the District

---

[2] *Id.* at *16.
[3] *Id.*
[4] *Id.* at *4.

of Connecticut which alleges that James J. Licata has committed two counts of federal felony 'Wire Fraud Affecting a Financial Institution,' and three counts of 'Money Laundering ....'"[5]

On June 28, 2006, the Chapter 11 cases were converted to Chapter 7 on motion of the United States of America. Trustees Richard Coan and Ronald Chorches were appointed to administer the estates of FCCG and Licata, respectively ("Trustee Coan" and "Trustee Chorches", collectively, the "Trustees").

On December 21, 2007, the United States District Court for the District of Connecticut entered a judgment in the criminal case against Licata.[6] The judgment notes that Licata pleaded guilty to one count of Wire Fraud under 18 U.S.C. § 1343, and that he was sentenced to serve a term of one day in jail and four years' supervised release. Licata was also ordered to participate in a mental health treatment program and to pay a $3,000 fine.

Prior to the appointment of the Trustees, during the pendency of the related Chapter 11 cases at issue here, the Official Committee of Unsecured Creditors filed a verified complaint against, *inter alia*, Licata and FCCG, alleging that Licata fraudulently transferred two parcels of real estate to his wife, Cynthia Licata, prior to the bankruptcy filings. On or about April 5, 2013, the Trustees stipulated to judgment with Cynthia Licata, pursuant to which, Cynthia Licata owes the bankruptcy estates the sum of $1,625,000.[7] The judgment owed to the bankruptcy estates by Mrs. Licata remains wholly unsatisfied.

On March 13, 2009, the Trustees commenced an Adversary Proceeding against Cynthia Licata, James Licata, East Coast Investments, LLC and First Connecticut Holding Group LLC,

---

[5] ECF No. 932 (All ECF Nos. relate to the case of *In re First Connecticut Consulting Group, Inc.*, No. 02-50852 (JJT), unless otherwise indicated).
[6] *See United States v. Licata*, 3:06-cr-00075-EBB, ECF No. 127.
[7] *See Chorches, et al. v. Licata, et al.*, Adv. Pro. No. 03-5045, ECF No. 466.

IV. The Trustees allege that, during the pendency of the Chapter 11 cases, Licata and Cynthia

Licata orchestrated an asset sale transferring estate property to Cynthia Licata, pursuant to a

certain "Transfer Settlement and Release Agreement," and that this shifting of assets from the

Estate to Licata's wife was not disclosed to this Court.[8] The causes of action include breach of

fiduciary duty and fraud upon this Court. That proceeding was stayed by order of this Court on

February 7, 2017 and remains in administrative suspense pending the outcome of two appeals.

On March 30, 2016, Trustee Chorches commenced an adversary proceeding against

Licata, seeking to deny him a discharge pursuant to Section 727 of the Bankruptcy Code as a

result of Licata's failure to assist the Trustees with their prosecution of the New Jersey

Litigation. The complaint alleges that, in 2013, the presiding judge in the New Jersey Litigation,

the Hon. James Rothschild, requested that the Trustees provide a forensic analysis evidencing the

amount of money Mr. Licata had invested in the Real Estate Assets (the "Forensic Analysis").[9]

Judge Rothschild informed the Trustees that this information would be important to his

determination on the merits as to the legal owner of the Real Estate Assets.[10] Mr. Licata then

informed counsel for the Trustees that he had recently completed an analysis for the IRS (the

"Tax Analysis") that would assist in the drafting of the Forensic Analysis.[11] Though Mr. Licata

voluntarily disclosed the existence of the Tax Analysis, he concedes that he never provided the

document to the Trustees.[12] The Trustees contend that Licata also failed to provide the

underlying information necessary to complete the Forensic Analysis without reference to the Tax

Analysis, and that this withholding greatly prejudiced the Trustees' ability to prosecute the New

---

[8] *See Coan, Trustee, et al. v. Cynthia Licata, et al.*, Adv. Pro. No. 09-5010.
[9] *Chorches v. Licata*, Adv. Pro. No. 16-05016 (ECF No. 1, the "Nondischargeability Complaint") at ¶ 26; Answer to Nondischargeability Complaint of James Licata (ECF No. 29, the "Answer") at ¶ 26.
[10] Nondischargeability Complaint at ¶¶ 26-27; Answer at ¶¶ 26-27.
[11] Nondischargeability Complaint at ¶ 27; Answer at ¶ 27.
[12] Nondischargeability Complaint at ¶ 28; Answer at ¶ 28.

Jersey Litigation on behalf of the estates. By order dated June 14, 2017, the Court denied

Licata's motion to dismiss Trustee Chorches' claims objecting to discharge.

During the pendency of the Chapter 7 cases, Mr. Licata repeatedly attempted to sell estate

assets without approval from the Trustees. Some of these attempts resulted in Licata receiving

money and judgments entering against the estates. For example, several years after the

conversion to Chapter 7, on September 21, 2010, Blackwells Asset Management, LLC, sued

Licata in the United States District Court for the District of Connecticut after one of its affiliates

advanced Mr. Licata $25,000 in connection with an anticipated Section 363 sale of estate

assets.[13] The sale was never consummated and Blackwells ultimately obtained a judgment

against Licata for $175,000.[14]

A similar pattern emerged a few years later, nearly seven (7) years after the conversion of

these cases to Chapter 7. On February 7, 2013, Licata and FCCG purported to sell Richard

Annunziata an interest in a variety of estate assets, including those related to the Disputed

Claims. The purchase price was $500,000 plus an additional $50,000 to Licata's then-attorney in

New Jersey. Mr. Annunziata subsequently filed for bankruptcy and the Chapter 7 trustee

assigned therein commenced suit against Licata, alleging that Mr. Annunziata "delivered checks

totaling $600,000 together with $300,000 in cash, to Licata and his wife, Cynthia Licata at a

diner in Connecticut in exchange for a transfer of Licata's 20% interest in FCCG" among other

alleged assets.[15] The causes of action include actual fraudulent transfers, which occurred while

the estates of FCCG and Licata were being administered by the Trustees. Corroborating these

---

[13] *See Blackwells Asset Management, LLC v. Bel Air Holdings, LLC and James Licata*, 1:10-CV-7252- CM, (ECF
No. 1, the "Blackwells Action").
[14] Blackwells Action, ECF No. 39.
[15] *Isaacson, Trustee v. Michael Annunziata, Individually and as Trustee, et al.*, Adv. Pro. No. 17-01351-CMG, (ECF
No. 1, the "Annunziata Action") at ¶ 83.

claims, Trustee Isaacson has produced financial statements evidencing the $900,000 in transfers that Mr. Licata and his wife allegedly procured.[16]

Notwithstanding this attempted sale of the Disputed claims – along with several other failed transactions orchestrated, at least in part, by Mr. Licata – on October 9, 2014, this Court (Shiff, J.) approved a settlement with Mocco and related parties (the "Settlement"). Pursuant to the Settlement, the Trustees agreed to sell the remaining assets of the estates, including the Disputed Claims, and thereby forfeit Licata's claims in the New Jersey Litigation.[17] Licata filed an objection to the Settlement, which Judge Shiff overruled, finding that Licata lacked standing to object. This determination was based on the Court's finding that Licata lacked a pecuniary interest in the estates, given that unsecured claims in the bankruptcy cases totaled approximately $120 million and the highest offer received for the assets—an offer that was never consummated—totaled only $12.6 million.[18] On appeal, the order approving the Settlement was affirmed by the District Court and the Court of Appeals, both of which held that Licata lacked standing to object to the Settlement.

On May 31, 2017, Licata filed the instant Motions to reconvert these Chapter 7 cases to cases under Chapter 11 of the Code. The Trustees each vehemently objected to the Motions. The Court held a hearing on the Motions on July 20, 2017. Limited evidence was advanced by counsel for the parties in the form of historical reference to the record, admissions and certain undisputed representations to the Court.

---

[16] *See* ECF No. 2710 at Ex. J.
[17] *In re First Connecticut Consulting Grp., Inc.*, No. 02-50852, 2014 WL 5092269, at *1 (Bankr. D. Conn. Oct. 9, 2014), *dismissed sub nom. Licata v. Coan*, No. 3:14-CV-1754 (MPS), 2015 WL 9699304 (D. Conn. Sept. 22, 2015), *aff'd sub nom. In re Licata*, 659 F. App'x 704 (2d Cir. 2016).
[18] *Id.* at *2-4, n. 13.

By way of the Motions, Licata proposes to fund a Chapter 11 plan through approximately $20 million in third-party financing (the "DIP Financing"). Though the funding commitment detailed in the Motions only provides for $10 million in financing, Licata's supplemental filings have advised that at least $20 million will be available to fund the proposed plan.[19] Licata has represented that the funding commitment is firm and that the Debtors intend to file a plan of reorganization within thirty days of the entry of an order granting reconversion of these cases. Though any borrowing under the proposed DIP Financing was to be repaid in full with at least eight percent interest within less than one year of reconversion, with the initially-scheduled maturity date of December 31, 2017, Licata asserts that the facility will be repaid in full through litigation proceeds or refinanced within this relatively short timeframe.[20] No draft plan, disclosure statement or detailed term sheet has been filed in support of this new round of promises.

Based upon Licata's alleged analysis, "the pool of valid unsecured claims totals approximately $7 million."[21] Licata proposes to draw upon the DIP Financing to pay unsecured creditors the sum of $2.1 million, which he claims would amount to a recovery of approximately 30%.[22]  More than four million dollars would be budgeted for professional fees, including at least two million dollars in attorneys' fees.[23] Licata has not provided any accounting of his financial affairs during the pendency of the Chapter 7 proceedings, though he has forecasted that the Debtors will file new schedules and Statements of Financial Affairs upon reconversion.[24]

---

[19] Corrected Amendment Post-Hearing Supplement of James Licata and First Connecticut Consulting Group, Inc., ECF No. 2723, at 6-7.
[20] ECF No. 2704, Ex. A at 5-6; ECF No. 2723 at 8.
[21] ECF No. 2723 at 6.
[22] ECF No. 2704 at ¶ 21.
[23] *Id.* at Ex. A.
[24] ECF No. 2723 at 4.

The proposed reorganization would be overseen by Mr. Licata's handpicked chief restructuring officer, G. Grant Lyon (the "CRO"), a seasoned bankruptcy professional, who, according to Licata, would be in a position to pursue all legitimate claims held by the estates, including both inter-estate claims and claims against Mr. Licata and his wife.

On September 12, 2017, the Court solicited supplemental briefing concerning Mr. Licata's standing to pursue the Motions.[25]

### Discussion

Armed with a new financing commitment, a seasoned restructuring officer and the truism that "these Bankruptcy Cases are nothing short of extraordinary,"[26] Licata calls upon the Court's discretion to reconvert these bankruptcy cases to Chapter 11. Mr. Licata concedes that the relief of reconversion a full decade after conversion to Chapter 7 is extraordinary and perhaps without precedent; yet, he insists that reconverting these bankruptcy cases provides the only path towards a swift and meaningful resolution for creditors.

The Chapter 7 Trustees, Richard Coan and Ronald Chorches, who have administered the bankruptcy estates of FCCG and Licata, respectively, for the past decade, oppose the Motions, along with the United States Trustee. According to the Trustees, these bankruptcy cases are only extraordinary insofar as Licata has ceaselessly interfered with – and thereby prolonged – the administration of each Chapter 7 estate and repeatedly misappropriated estate assets, both during the pendency of the Chapter 11 proceedings and after the bankruptcy cases were converted to Chapter 7 for cause.  Therefore, the Chapter 7 Trustees argue that conversion to Chapter 11 would be futile because cause already exists, under Section 1112(b) of the Code, to reconvert the bankruptcy cases back to Chapter 7.

---

[25] *See* ECF No. 2730.
[26] ECF No. 2704 at ¶ 22.

The Trustees also assail Licata's proffered value proposition for this 'reorganization' and apparent collateral for its financing—namely, the pursuit of certain claims and causes of action held by the estates, many of which Licata has unsuccessfully pursued in state and federal courts across the country for nearly two decades, and which the Chapter 7 Trustees either abandoned or conclusively settled, with the approval of this Court, the District Court for the District of Connecticut and the United States Court of Appeals for the Second Circuit. According to the Trustees, any effort to 'reorganize' around such claims presents an improper collateral attack on final orders, while exhausting limited judicial resources, as Licata seeks yet another bite at the apple in state and federal courts across the country with the apparent imprimatur of this Court.

All but conceding that his "checkered" past precludes him from serving as a fiduciary for either bankruptcy estate, Licata seeks to circumvent the application of Section 1112(b) by retaining his handpicked chief restructuring officer to administer both estates.[27] Further, Licata maintains that: (1) certain valuable (yet largely unspecified) claims have never been litigated; (2) the CRO will determine whether to pursue particular causes of action; and (3) the CRO will not seek to revisit litigation or Court-approved settlements without existing, valid grounds to do so. In short, Licata, a debtor recognized by various courts as lacking credibility, assures us that everything has been prepackaged to remove him from the equation, with the exception of a consultation agreement arranged with the proposed lender.

### A. Section 706 Conversion Standards

Section 706 of the Bankruptcy Code governs conversion of a case from Chapter 7 to one under Chapter 11 of the Code. Subsection (a) of 11 U.S.C. § 706 applies specifically to a debtor's motion for conversion, and reads, in pertinent part, as follows: "The debtor may convert a case

---

[27] July 20, 2017 Hearing on Motions, ECF No. 2718 at 7:03-37, 21:08-20, 124:01-33.

under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under Section 1112, 1208, or 1307 of this title." When read in conjunction with subsection (d), subsection (a) of 11 U.S.C. § 706 provides Chapter 7 debtors with the right to convert their case to Chapter 11 unless: (i) the case has previously been converted from Chapter 11 for cause, pursuant to 11 U.S.C. § 1112(b); (ii) the debtor is ineligible, pursuant to 11 U.S.C. § 109(d), to be a debtor under Chapter 11; or (iii) cause exists to dismiss or reconvert the case back to Chapter 7, pursuant 11 U.S.C. § 1112(b). *See* 11 U.S.C. § 706(a), (d); 11 U.S.C. § 109(d) (threshold eligibility criteria for Chapter 11); *In re FMO Assocs. II, LLC*, 402 B.R. 546, 550-51 (Bankr. E.D.N.Y. 2009) (citing *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 127 S. Ct. 1105, 166 L. Ed. 2d 956 (2007)). While subsection (a) of Section 706 affords honest but unfortunate debtors "an absolute right to convert their cases from Chapter 7", Chapter 7 debtors who engage in "atypical" or "extraordinary" bad-faith conduct may be barred from converting their cases. *Marrama*, 549 U.S. at 374, n. 11.

In *Marrama*, for example, the Supreme Court affirmed the denial of a debtor's motion for conversion on account of that debtor's failure to disclose an anticipated tax refund and the transfer of a significant asset. *See id* at 370. Though *Marrama* was decided in context of a motion for conversion to Chapter 13, the principle announced therein – that a debtor's bad faith conduct may vitiate their otherwise absolute right to convert their case pursuant to Section 706(a) – applies with equal force to motions seeking conversion to Chapter 11. *In re FMO*, 402 B.R. at 550-51 (collecting cases and applying *Marrama* to bar conversion to Chapter 11).

Courts are divided as to whether the language of Section 706(a) precludes debtors from seeking reconversion, as the provision states that a debtor may convert a case, "if the case has not been converted under Section 1112, 1208, or 1307" of the Code. 11 U.S.C. § 706(a). Some courts

11

interpret this language as barring debtors from seeking reconversion outright. *See, e.g.*, *In re Muth*, 378 B.R. 302, 303 (Bankr. D. Colo. 2007); *In re Hardin*, 301 B.R. 298, 299-300 (Bankr. C.D. Ill. 2003); *In re Banks*, 252 B.R. 399, 403 (Bankr. E.D. Mich. 2000); *In re Vitti*, 132 B.R. 229, 230-31 (Bankr. D. Conn. 1991). Other courts hold that debtors may seek reconversion under subsection (a) at the Court's discretion. *See, e.g.*, *In re Povah*, 455 B.R. 328, 341 (Bankr. D. Mass. 2011) (holding that debtor's motion for reconversion was permitted, but "must be closely scrutinized ... and the debtor also must establish both good faith and the feasibility of any plan of reorganization.") (internal citation omitted); *In re Johnson*, 376 B.R. 763, 764 (Bankr. D.N.M. 2007) (holding that "reconversion is permitted under 706(a), and that such determination falls within the Court's discretion.").

Consequently, few, if any, courts have determined whether a debtor may seek reconversion under subsection (b) of Section 706. Rather than addressing debtors or particular parties specifically, subsection (b) applies broadly to any party in interest: "On request of a party in interest and after notice and a hearing, the court may convert a case [under Chapter 7] to a case under Chapter 11 of this title at any time." 11 U.S.C. § 706(b). Typically, creditors and trustees rely upon Section 706(b), seeking to compel increased payment from debtors with considerable income. *See, e.g.*, *In re Baker*, 503 B.R. 751, 753 (Bankr. M.D. Fla. 2013) (creditor moved to convert Chapter 7 case of doctor under Section 706(b)); *In re Karlinger-Smith*, 544 B.R. 126, 130 (Bankr. W.D. Tex. 2016) (U.S. Trustee moved for conversion "as the debtors have the ability to pay a substantial dividend to their creditors based on their significant disposable income.").

The plain language of Section 706(b) states that the court "may" convert, as opposed to "shall" convert, conveying that the decision to convert remains within the sound discretion of the court. The legislative history of Section 706(b) reaffirms the text's explicit grant of discretion:

"The decision whether to convert is left in the sound discretion of the court, based on what will most inure to the benefit of all parties in interest." H.R.Rep. No. 595, 95th Cong., 1st Sess. at 380 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963; S.Rep. No. 989, 95th Cong.2d Sess. at 94 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787.

"Section 706(b) does not provide guidance regarding the factors a court should consider." *In re Schleuber*, 489 B.R. 570, 573 (B.A.P. 8th Cir. 2013), *aff'd*, 558 F. App'x 715 (8th Cir. 2014). Therefore, in determining whether to convert a case under § 706(b), courts "should consider anything relevant that would further the goals of the Bankruptcy Code." *Proudfoot Consulting Co. v. Gordon (In re Gordon)*, 465 B.R. 683, 692 (Bankr. N.D. Ga. 2012); *see also In re Decker*, 535 B.R. 828, 839 (Bankr. D. Alaska 2015) ("[C]ourts may consider a multitude of factors, depending upon the circumstances of each case, to assess the benefits of conversion to all parties.").

Courts have relied upon various factors in determining whether a Section 706(b) conversion would be appropriate, including: "(1) the debtor's ability to repay debt; (2) the absence of immediate grounds for reconversion; (3) the likelihood of confirmation of a Chapter 11 plan; and (4) whether the parties in interest would benefit from conversion." *Decker v. Office of the United States Tr.*, 548 B.R. 813, 817 (D. Alaska 2015); *In re Hardigan*, 517 B.R. 374, 383 (S.D. Ga. 2014); *see also Schleuber*, 489 B.R. at 574 (affirming bankruptcy court's reliance on ability to pay and potential for confirmation).

Where immediate grounds for reconversion or dismissal under Section 1112(b) exist, however, "conversion from Chapter 7 under § 706(b) would be a futile and wasted act." *In re Ryan*, 267 B.R. 635, 638 (Bankr. N.D. Iowa 2001). As the Supreme Court reasoned in *Marrama*, "the broad authority granted to bankruptcy judges to take any action that is necessary or appropriate 'to prevent an abuse of process' described in § 105(a) of the Code, is surely adequate to authorize an

13

immediate denial of a motion to convert filed under § 706 in lieu of a conversion order that merely postpones the allowance of equivalent relief and may provide a debtor with an opportunity to take action prejudicial to creditors." *Marrama*, 549 U.S. at 375.

A debtor has a fiduciary "obligation to treat all parties, not merely the shareholders, fairly." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355–56, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *see also In re Euro-Am. Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007) ("A chapter 11 debtor and its managers owe fiduciary duties to the estate."). Willful failure to meet this obligation, including self-dealing, constitutes cause for conversion under Section 1112(b). *See In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 359 (Bankr. S.D.N.Y. 2001); *Babakitis v. Robino (In re Robino)*, 243 B.R. 472, 485 (Bankr. N.D. Ala. 1999); *In re Fed. Roofing Co., Inc.*, 205 B.R. 638, 642–43 (Bankr. N.D. Ala. 1996).

Conversion may, likewise, be denied to prevent an abuse of the bankruptcy system. *See e.g.*, *Willis v. Rice (In re Willis)*, 345 B.R. 647, 655 (8th Cir. BAP 2006) (denial of individual debtor's request to convert from Chapter 7 to Chapter 11 under Section 706(b) was justified based on debtor's "fraudulent, evasive, and uncooperative behavior"). "Additionally, courts have considered whether the debtor has a business to reorganize as well as the debtor's assets, business operations, and whether a separate business infrastructure exists." *In re Home Network Builders, Inc.*, 2006 WL 3419791, at *3 (D.N.J. Nov. 22, 2006), citing *In re Lenhartz*, 263 B.R. 331, 335 (Bankr. D. Idaho 2001); *Thompson v. Daluise (In re Wet-Jet Int'l Inc.)*, 235 B.R. 142, 153 (Bankr. D. Mass.1999).

While the existence of a business to reorganize may be relevant, "it is not necessary that a Chapter 11 debtor be engaged in business to reorganize." *Schlehuber*, 489 B.R. at 575, citing *Toibb v. Radloff*, 501 U.S. 157, 166, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) ("[Bankruptcy] Code

contains no 'ongoing business' requirement for Chapter 11 reorganization"). Nonetheless, "an entity may not file a petition for reorganization which is solely designed to attack a judgment collaterally—the debtor must have some intention of reorganizing." *In re C–TC 9th Ave. P'ship*, 113 F.3d 1304, 1310 (2d Cir.1997). Indeed, any attempt by these Debtors to use the bankruptcy court "not to reorganize, but to relitigate" presents an "impermissible use of Chapter 11". *Id.*

### B.  Licata Qualifies As A "Party In Interest" Under Section 706(b)

Licata asserts that he qualifies as a "party in interest" under Section 706(b), given his role as the debtor in his individual case and as the president and fifty percent shareholder of FCCG. Though a few courts have posited in *dicta* that a debtor qualifies as a "party in interest" under Section 706(b),[28] Mr.  Licata has failed to identify a single decision which holds that a debtor is entitled to invoke the provision.

"[A] 'party in interest' is not defined in the [Bankruptcy] Code; when interpreting the meaning of that phrase [courts] are governed by the Code's purposes." *Church Mut. Ins. Co. v. Am. Home Assur. Co. (In re Heating Oil Partners, LP)*, 422 Fed.Appx. 15, 17 (2d Cir. 2011) (quoting *In re Comcoach Corp.*, 698 F.2d 571, 573 (2d Cir. 1983)). "Whether a party qualifies as a 'party in interest' is determined on a case-by-case basis, taking into consideration whether that party has a 'sufficient stake' in the outcome of that proceeding, which can include having a pecuniary interest directly affected by the bankruptcy proceeding." *Id.*

"It is well-established that a Chapter 7 debtor is a 'party in interest' and has standing to object to a sale of the assets, or otherwise participate in litigation surrounding the assets of the estate, only if there could be a surplus after all creditors' claims are paid." *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 115 (2d Cir. 2000); *accord In re Licata*, 659 F. App'x 704, 706 (2d

---

[28] *See, e.g., Lafountaine v. Grobstein* (*In re Lafountaine*), 2016 WL 3344003 at *2 (B.A.P. 9th Cir. June 7, 2016).

Cir. 2016) ("To establish standing, the Chapter 7 debtor has the burden of showing that there is at least a reasonable possibility of a surplus."). "This rule applies to a debtor's standing to object to a claim against the estate." *Pascazi v. Fiber Consultants, Inc.*, 445 B.R. 124, 127 (S.D.N.Y. 2011); *Licata v. Coan*, 2015 WL 9699304, at *5 (D. Conn. Sep. 22, 2015). "[T]he general rule is that a debtor lacks standing to object to a claim because bankruptcy proceedings absolve the debtor of any liability to creditors and the debtor has no interest in the distribution of the estate's property since the property has passed to the trustee." *In re Ferraro*, 2017 WL 874977, at *3 (Bankr. D. Conn. Mar. 3, 2017).

According to the Trustees, this general rule applies here to bar Licata from qualifying as a "party in interest" under Section 706(b) or from otherwise maintaining standing to intervene in these bankruptcy cases. Indeed, this Court (Shiff, J.), the United States District Court for the District of Connecticut, and the United States Court of Appeals for the Second Circuit, each held that Licata lacked standing to object to the Settlement, given that there was no reasonable prospect that Mr. Licata would receive a distribution from either the bankruptcy estate of FCCG or his individual Chapter 7 bankruptcy estate. *See In re First Connecticut Consulting Group, Inc.*, 2014 WL 5092269 (Bankr. D. Conn. Oct. 9, 2014); *Licata v. Coan*, 2015 WL 9699304 (D. Conn. Sept. 22, 2015); *In re Licata*, 659 Fed. Appx. 704 (2d Cir. 2016).

Were this the end of the inquiry, there could be no doubt that Licata lacks a pecuniary interest in these proceedings and thus would not qualify as a "party in interest" under Section 706(b). However, on March 30, 2016, Trustee Chorches filed a complaint seeking to deny Licata's bankruptcy discharge pursuant to Section 727 of the Bankruptcy Code. *See Chorches, Trustee v. Licata*, Adv. Pro. No. 16-05016. If Trustee Chorches prevails, Licata will remain liable to his creditors after the conclusion of his Chapter 7 bankruptcy case. The possibility that Licata will not

16

receive a discharge is enough, at this stage, to find that he may have a pecuniary interest in the outcome of his individual case. Therefore, Licata qualifies as a "party in interest" under Section 706(b), at least with respect to his individual Chapter 7 case.[29]

### C. Licata's Proposed Reconversion Is Futile And Threatens an Abuse of the Bankruptcy System

The relief requested by the Motions appears to be unprecedented in at least two respects. First, Licata has failed to identify a single case that was reconverted to Chapter 11 after proceeding for several years in Chapter 7, much less a full decade after conversion to Chapter 7. Second, Licata has failed to identify a single case that was reconverted to Chapter 11, under Section 706(b), on the motion of a debtor.

While the procedural posture of the Motions is unquestionably anomalous, their substance is far more troubling. As explained below, reconversion is futile for two independent reasons: 1) In light of Licata's extensive record of fraudulent, abusive and evasive conduct, "cause" already exists to immediately convert these cases back to Chapter 7, pursuant to Section 1112(b); and 2) Licata's proposed Chapter 11 plan is patently unconfirmable. Beyond futility, reconversion of these bankruptcy cases threatens an abuse of the bankruptcy system, which the Court, in its discretion, simply cannot sanction.

In addition to facilitating a prepetition fraudulent transfer to his wife, filing the LLC bankruptcy cases in bad faith, and pleading guilty to one count of Wire Fraud, Licata has all but conceded that he wrongfully attempted to sell estate assets while these bankruptcy estates were subject to the exclusive administration of the Chapter 7 Trustees.[30] Licata has also conceded that he failed to provide the Trustees with information that may have been important to their

---

[29] Though this line of reasoning does not apply to the Chapter 7 case of FCCG, the Court assumes, without deciding, that Mr. Licata qualifies as a party in interest with respect to FCCG as well.

[30] *See, e.g.,* Licata's First Amended Answer and Counterclaims in the Blackwells Action, ECF No. 6 at ¶ 71.

prosecution of the New Jersey Litigation on behalf of the estates.[31] In this context, there can be no

doubt that Licata's extraordinary failures to comply with his fiduciary duties constitutes "cause"

to convert the cases under Section 1112(b). *See In re Hampton Hotel Inv'rs, L.P.*, 270 B.R. at 359;

*Willis*, 345 B.R. at 655.[32] Therefore, "conversion from Chapter 7 under Section 706(b) would be

a futile and wasted act." *In re Ryan*, 267 B.R. 635, 638 (Bankr. N.D. Iowa 2001).[33]

Because Licata's plan hinges upon highly speculative (and undisclosed) litigation

recoveries, it is also patently unconfirmable. A plan is confirmable only if it is feasible—that is,

if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for

further financial reorganization, of the debtor or any successor to the debtor under the plan,

unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

"[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success

need not be guaranteed." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1998). "A

plan will not be feasible if its success hinges on future litigation that is uncertain and speculative,

because success in such cases is only possible, not reasonably likely." *In re Am. Capital Equip.,*

*LLC*, 688 F.3d 145, 156 (3d Cir. 2012). This is especially true where, as here, most of the claims

that could provide for a recovery have already been dismissed, resolved or otherwise proven

---

[31] *See supra* at n. 12.

[32] Indeed, the Supreme Court has upheld the revocation of a Chapter 7 debtor's otherwise absolute right to convert their case pursuant to Section 706(a) for far less egregious conduct than the litany of bad faith conduct at issue here. *See Marrama*, 549 U.S. at 370-74 (affirming denial of debtor's motion for conversion because debtor failed to disclose an anticipated tax refund and transfer of significant asset).

[33] Seeking to avoid the application of Section 1112(b), Licata asserts that the proposed intervention of his hand-picked CRO renders any prior bad-faith conduct irrelevant for purposes of the Motion. The Court disagrees. Though Section 1112(b) permits the appointment of a trustee in lieu of conversion, the provision requires that any such appointment follow the procedures set forth in Sections 1104 and 702 of the Code. *See* 11 U.S.C. §§ 1112(b)(1), 1104(b)(1). Pursuant to Section 702, the creditors of an estate, not the debtor or an insider of the debtor, may vote to elect a trustee. *See* 11 U.S.C. § 702(a). Quite simply, Licata cannot avoid conversion for "cause" under Section 1112(b) by ignoring the Code's established procedures for selecting a trustee and instead enlisting his preferred restructuring professional.

unsuccessful. *See id.* Licata's plan, which is premised upon relitigating settled claims and

attacking final orders, is not feasible and thus is patently unconfirmable.[34]

To be confirmable, a plan must be proposed "in good faith and not by any means

forbidden by law." 11 U.S.C. § 1129(a)(3). "[T]he term 'good faith,' as used in Section

1129(a)(3) [of the Bankruptcy Code], ... is generally interpreted to mean that there exists a

reasonable likelihood that the plan will achieve a result consistent with the objectives and

purposes of the Bankruptcy Code." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 74 (Bankr.

S.D.N.Y. 2015) (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 424 (7th Cir.1984)); *accord*

*In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir.2012) ("[T]he important point of

inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the

objectives and purposes of the Bankruptcy Code.").  The objectives and purposes of the Code

include "preserving going concerns and maximizing property available to satisfy creditors,"

"giving debtors a fresh start in life," "discourag[ing] debtor misconduct," "the expeditious

liquidation and distribution of the bankruptcy estate to its creditors," and "achieving fundamental

fairness and justice." *Am. Capital Equip., LLC*, 688 F.3d at 156–57 (internal citations and

quotation marks omitted).

None of these objectives would be served by Licata's proposed Chapter 11 plan. To the

contrary, the record makes clear that the plan seeks "not to reorganize, but to relitigate" and

therefore presents "an impermissible use of Chapter 11." *In re C–TC 9th Ave. P'ship*, 113 F.3d

1304, 1310 (2d Cir.1997) (internal quotation omitted).  Licata does not propose to reorganize any

---

[34] Furthermore, this fatal feasibility defect cannot be cured through the acquisition of the proposed DIP Financing.
Apart from advancing several million dollars for the Debtors' professional fees, the DIP Financing would simply
pile more debt upon the estates before it too would require restructuring. Indeed, Licata has already acknowledged
that the DIP Financing would have to be refinanced in the near-certain event that any litigation proceeds could not
be recovered before the facility matures.  *See* ECF 2723 at 8.

ongoing business, but instead seeks to advance a plan "around the existing claims and causes of

action of the estates."[35] Apart from pursuing certain unspecified title insurance claims, which

appear to arise out of the Disputed Claims, the plan seeks to pursue the Disputed Claims, which

were conclusively settled by Order of this Court, the United States District Court for the District

of Connecticut, and the United States Court of Appeals for the Second Circuit. Through the plan,

Licata also intends to challenge Judge Brown's ruling in the LLC cases, because, in his view,

that decision "was premised on perjured testimony, falsified documents, and some indication of

*ex parte* communication between the judge up there and third parties to the case."[36] Even the

dividend that Licata's plan proposes to pay unsecured creditors is premised upon a conclusory

evaluation of total claims that drastically undercuts this Court's prior findings.[37] Quite simply, a

plan focused on attacking final orders of multiple courts cannot be said to serve the Chapter 7

estates, their creditors or the purposes of the Bankruptcy Code.

Moreover, Licata's plan to renew a flurry of misguided litigation, more than fifteen (15)

years into these bankruptcy cases, will not further the expeditious liquidation and distribution of

the bankruptcy estates to their creditors. Even if such a plan were confirmable, the almost-certain

proliferation of pre-confirmation litigation would necessarily heap additional delays upon an

already stagnant process. Given the tortured history of these cases and the patently

unconfirmable nature of the proposed plan, one might reasonably infer that the Motions seek not

to expedite but to impede, delay and ultimately defeat the bankruptcy process, which may

otherwise call upon Mr. and Mrs. Licata to account for their actions.

---

[35] ECF No. 2723 at 4.

[36] July 20, 2017 Hearing on Motions, ECF No. 2718, at 26:12-26:25.

[37] See *In re First Connecticut Consulting Grp., Inc.*, No. 02-50852, 2014 WL 5092269, at *4 (Bankr. D. Conn. Oct. 9, 2014) (finding that unsecured claims in the bankruptcy cases of Licata and FCCG totaled approximately $120 million).

Notably, despite the apparent enticements for unsecured creditors, not one creditor announced support for the proposed Chapter 11 plan. Licata's plan would likely trade dismissal of Trustee Chorches' nondischargeability claims against Licata in favor of providing an uncertain dividend to unsecured creditors that would license, rather than discourage, debtor misconduct.

Any one of the above concerns would be enough to support the conclusion that the Chapter 11 plan has not been proposed in "good faith".  When viewed in concert, however, the Court has no trouble concluding that the totality of the circumstances here support a finding that Licata's plan has not been proposed in "good faith" and thus cannot be confirmed.

Finally, as a matter of this Court's discretion under Section 706(b), if not as a matter of law, this Court will not sanction a wave of relitigation in courts across the country on behalf of a misguided litigant, now in his fifteenth year of bankruptcy. The judicial interests in finality, efficient administration and fundamental fairness militate against expanding these tangled proceedings with more strands and additional loops and knots.

Accordingly, the Motions are denied and the Objections thereto are sustained.

IT IS SO ORDERED at Hartford, Connecticut this 10th day of January 2018.

James J. Tancredi
United States Bankruptcy Judge
District of Connecticut